William E. BROCK, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

KENTUCKY RIDGE MINING CO., INC., Letcher White And Norton Minerals, Inc., Defendants.

Civ. A. No. C–85–0180–0(M).

United States District Court, W.D. Kentucky, Owensboro Division.

Oct. 11, 1985.

U.S. Dept. of Labor, Office of the Sol., Nashville, Tenn. by W.F. Taylor, Francis X. Lilly, Bobbye D. Spears and Carl W. Gerig, Jr., for plaintiff.

Kentucky Ridge Min. Co., pro se.

Letcher White, pro se.

Thomas & Ison, Hopkinsville, Ky. by Daniel N. Thomas, for Norton Minerals, Inc.

## MEMORANDUM AND ORDER GRANTING PRELIMINARY INJUNCTION

MEREDITH, District Judge.

On September 12, 1985, the plaintiff, William E. Brock, Secretary of Labor, United States Department of Labor, filed the above-styled action alleging violations by the defendants, Kentucky Ridge Mining Co., Inc., Letcher White and Norton Minerals, Inc., of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201, *et seq.*) hereinafter referred to as the Act. Plaintiff also filed at that time a Motion for Preliminary Injunction and an Application for Temporary Restraining Order. The Application for Temporary Restraining Order was granted on September 12, 1985, enjoining the defendants from transferring, releasing, disposing of or attempting to dispose of, liquidating, divesting, removing, allowing the removal of or attempting to remove quantities of coal located at various sites in Western Kentucky alleged to have been produced or mined in violation of the Act. The Temporary Restraining Order originally entered into on September 12, 1985, has remained in effect since that date to the present. After conducting a full evidentiary hearing, the Court makes the following findings of fact and conclusions of law in reaching its decision to grant plaintiff's Motion for Preliminary Injunction.

## FINDINGS OF FACT

1. This Court has jurisdiction of the subject matter and of the parties.

2. Defendant, Kentucky Ridge Mining Co., Inc., was a Kentucky Corporation and Defendant, Letcher White, was President and sole owner of Kentucky Ridge Mining Co., Inc.

3. Kentucky Ridge Mining Co., Inc.'s principal business involved the producing and/or mining of raw coal.

4. Defendant, Norton Minerals, Inc., is a Kentucky Corporation which made and entered into a "Contract Mining Agreement" with Kentucky Ridge Mining Co., Inc. on June 18, 1985. This mining agreement entailed the mining and removal of coal from a leasehold owned by Norton Minerals, Inc. The leasehold at issue, as owned and/or leased by Norton Minerals, Inc., is collectively identified as the West Kentucky Number Four (4) seam of coal; specifically the Nortonville South No. 4 Mine. The Nortonville South No. 4 Mine is located in Hopkins County, Kentucky.

5. Kentucky Ridge Mining Co., Inc. and Letcher White employed some thirty-one (31) employees who at a time subsequent to June 18, 1985, were regularly engaged in the production and mining of the coal located at the Nortonville South No. 4 Mine and

continued to be employed in this capacity until on or about August 29, 1985.

6. The "Contract Mining Agreement" entered into by Kentucky Ridge Mining Co., Inc. and Norton Minerals, Inc., on June 18, 1985, encompassed thirteen (13) pages which contained the various, following provisions: (1) (Paragraph 3, page 2) Kentucky Ridge Mining Co., Inc. was to be considered an independent contractor, (2) (Paragraph 6, page 5) Norton Minerals, Inc. had right of inspection of mining operations, (3) (Paragraph 16, page 8) Norton Minerals, Inc. retained ownership at all times of the coal produced and transported under the terms of the "contract mining agreement" and (4) (Paragraph 19, page 8) Kentucky Ridge Mining Co., Inc., was to be paid $16.00 per ton of 2,000 pounds based on the tonage invoiced to the buyer pursuant to terms contained in the "contract mining agreement."

7. The coal mined from the Nortonville South No. 4 Mine was to be shipped to locations outside of the Commonwealth of Kentucky.

8. From on or about July 12, 1985, until on or about August 29, 1985, varying numbers of the thirty-one (31) employees working at the Nortonville South No. 4 Mine were paid wages at rates less than the applicable minimum hourly rate prescribed in the Act. In addition, many of them worked more than 40 hour weeks without being compensated for their employment in excess of the 40 hours at rates not less than one and one-half times the regular rates at which they were paid as prescribed by the Act and as alleged in plaintiffs' complaint.

9. Norton Minerals Inc. was aware that the employees working the Nortonville South No. 4 Mine were not being paid as evidenced by an employee meeting held on or about August 22, 1985, at which time the President of Norton Minerals, Inc., Mr. Nathaniel Gunn, attended and spoke with employees.

10. Coal as mined by employees of Kentucky Ridge Mining Co., Inc. at the Nortonville South No. 4 Mine during the period of time from on or about July 12, 1985, until on or about August 29, 1985, is located at the present time at the three following sites in the approximate amounts:

1. The washing facility owned by Don Bowles with 600 tons of raw coal hauled to the facility and a remainder of 350 tons after the washing process;

2. The washing facility owned by Smith Contracting Company with 562 tons of raw coal hauled to the facility and a remainder of 281 tons after the washing process;

3. The pit located at the Nortonville South No. 4 Mine containing 2500 tons of raw coal of disputed quality.

11. The coal stored in the three locations above has the potential to become, in the very near future, if not already, "hot" coal as it is known in the coal mining industry. "Hot" coal is coal that is susceptible to spontaneous combustion. The coal in the three above locations has been stored for at least a month. There is also a distinct probability of the value and/or merchantability of the coal further diminishing if storage is continued.

## CONCLUSIONS OF LAW

The above stated findings of fact were elicited from the testimony given and evidence introduced at the evidentiary hearing. It is within the purview of the Court to determine the weight and sufficiency of the evidence and the credibility of the witnesses. It should be emphasized, however, that the Court's ruling today only goes so far as to maintain the status quo and the determination of the merits of the over-all action remains for another day.

The Department of Labor alleges in its complaint that various employees working in an underground mine in Hopkins County, Kentucky, were not paid minimum wage or overtime pay as required by the Fair Labor Standards Act of 1938, as amended; 29 U.S.C. § 201, *et seq.* for a period of approximately six weeks. Some thirty individuals upheld their end of the employment relationship and mined the coal at the Nortonville South No. 4 Mine. Most, if any,

never received the total compensation they were promised for their efforts. This Court believes that the set of circumstances herein is a classic example of the type which Congress had in mind when it passed the Fair Labor Standards Act. (FLSA).

Thus, the legal analysis of this case must begin by addressing the Congressional findings and declarations of policy as contained in 29 U.S.C. § 202. This particular section of the statute highlighted Congress' concern for "the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers" and it was this concern that mandated the passage of the Fair Labor Standards Act of 1938. The concerns for a minimum standard of living and the well-being of workers are just as great in 1985 as they were in 1938.

■ The plaintiff has alleged that the activities that the employees engaged in at the Nortonville South No. 4 Mine were activities constituting "commerce" or "production of goods for commerce" within the meaning of 29 U.S.C. § 203(b) and (j). The testimony of defendant, Letcher White, substantiates plaintiff's claim that the employees were involved in the production of goods for commerce. It cannot be disputed that the employees in question were involved in the process of mining coal which easily falls under the 203(j) definition of "produced." A second critical issue is whether the production occurred in "commerce." The 203(b) definition of commerce is:

"commerce" means trade, commerce, transportation, transmission or communication among the several States or between any State or any place outside thereof.

Mr. White testified under oath that a representative of Norton Minerals, Inc., had discussed with him the expectation that the coal mined at the Nortonville South No. 4 Mine would ultimately be sold to the Georgia Power and Light Company. All other parties were given the opportunity to cross-examine Mr. White to clarify his testimony as well as the opportunity to impeach his testimony; this evidence remains uncontroverted. The transaction contemplated with the Georgia Power and Light Company would constitute "commerce." As pointed out in *Enterprise Box Co. v. Fleming*, 125 F.2d 897 (5th Cir., 1942), "production of goods for commerce," within the FLSA, includes the production of goods which the employer expects to move in interstate commerce. It is clear from Mr. White's testimony that he expected some, if not all, of the coal mined to move outside of the Commonwealth of Kentucky.

■ The plaintiff had the authority to gather data and investigate possible violations of the FLSA as provided for in 29 U.S.C. §§ 211(a) and 216(c). 29 U.S.C. § 211(a) provides in pertinent part:

... the Secretary of Labor shall bring all actions under Section 217 of this title to restrain violations of this chapter.

The testimony of Defendant Letcher White, Department of Labor Compliance Specialist Jerry Kaelin and former employees of Kentucky Ridge Mining Co., Inc., William Reddick and Jerry Prowse indicated the employment and payment of wage practices utilized by Kentucky Ridge Mining Co., Inc., on or about July 12, 1985, until on or about August 29, 1985, clearly constituted violations of several of the provisions of the Fair Labor Standards Act of 1938, as amended. Specifically defendants, Kentucky Ridge Mining Co., Inc. and Letcher White, violated 29 U.S.C. Sections 206, 207, 215(a)(2) and in that they violated 29 U.S.C. Sections 206, 207, 29 U.S.C. Section 215(a)(1) has also been violated. The evidence clearly shows and is totally uncontroverted that violations of the FLSA in regards to the payment of minimum wages and over-time pay occurred on numerous occasions at the Nortonville South No. 4 Mine on or about July 12, 1985, until on or about August 29, 1985.

Violations of the statutes and regulations of the Fair Labor Standards Act mandates injunctive relief in certain circumstances and failure to grant injunctive relief can constitute abuse of discretion on the part of the trial court. In *Wirtz v. Flame Coal*

*Co.,* 321 F.2d 558 (6th Cir., 1963), the District Court of Eastern Kentucky refused to grant injunctive relief in a case where the wage and hour sections as well as the record keeping provisions of the FLSA were violated. The Secretary of Labor appealed the district court's decision which was reversed and remanded. The defendant coal companies were inoperative at the time of the hearing in district court and all of the defendants' mining equipment was heavily mortgaged. The Court of Appeals, in reversing the district court's decision, found that there was substantial evidence to establish that defendants had violated provisions of the Act and that even though defendants had ceased their operations that evidence was insufficient to warrant reasonable belief that such violations would not be continued in the future.

■ As indicated in the *Wirtz* case and a consideration that would be applicable in the case at bar, "There is nothing to prevent the defendants from resuming their mining operation. Certainly there is no affirmative indication they will not. Though their equipment is heavily mortgaged, and although the defendants may have ceased operations prior to institution of suit, these considerations alone do not negate the possibility of resumed activity." The violations of the Act were clearly enjoinable in the *Wirtz* case; and therefore, under like circumstances injunctive relief should be granted in the present instance. Thus, the mootness issue raised by the defendant, Norton Minerals, Inc. in regard to Kentucky Ridge Minings' "insolvency" status is without merit.

■ Next, the Court must consider Whether the exclusionary clause of 29 U.S.C. § 203(i) is applicable to the case at bar. Norton Minerals, Inc. alleges that the coal delivered to the "washing facilities" constitutes "goods" as delivered into the actual physical possession of the ultimate consumer. Section 203(i) goes on to further limit this definition of goods in reference to producers, manufacturers and processors. Norton Minerals, Inc., states on page three of its Memoranda and Motion to

Deny Injunctive Relief that it was unsuccessful in its endeavors to sell the coal on either the Smith or Bowles lots to the respective owners. Furthermore, Norton Minerals, Inc. indicated that both Smith and Bowles were "processors" on page five of its answer and counterclaim. Norton Minerals, Inc. has cited no authority as to how the two washer facilities could be construed as "ultimate consumers" as opposed to "processors" and this Court remains unconvinced. As stated in *Gordon v. Paducah Ice Mfg. Co.,* 41 F.Supp. 980 (W.D.Ky. 1941):

> The fact that goods are sold and delivered entirely within one state does not prevent the sale from being a part of interstate commerce. Where goods or commodities are bought for use beyond state lines and it is understood by both the seller and the purchaser that they are to be promptly transported by the purchaser in interstate commerce, the sale of such goods or commodities is in itself a part of interstate commerce.

Finally, Defendant, Norton Minerals, Inc., contends that the injunctive relief available pursuant to 29 U.S.C. § 215(a)(1) is not applicable to it under the current circumstances. The Court is in total agreement with many of the points set out on page five of Defendants' Memoranda and Motion to Deny Injunctive Relief and would like to take this opportunity to address them. The Court totally agrees that injunctive relief is an extraordinary remedy which should not be utilized in an improvident manner. The burden of proof does lie with the plaintiff to establish a need to impose injunctive relief. The four standards enunciated in *American Motor Sales Corporation v. Runke,* 708 F.2d 202 (6th Cir., 1983) were considered by the Court in determining whether an injunction was appropriate and the Court hereby holds that the plaintiff did sustain its burden in that respect. It should be noted that precedent exists that irreparable injury is not required to be shown where an injunction is requested to prevent violations of an act establishing an important public policy. *Fleming v.*

*Phipps,* 35 F.Supp. 627 (D.Md., 1940). This position was reiterated in Plaintiff's Memorandum Brief in Support of Temporary Restraining Order and Preliminary Injunction. This does not preclude the Court from making the equitable considerations as required in *Runke, supra;* it does, however, temper these considerations as evidenced by Congress' passage of this Act.

■ Another issue raised by Norton Minerals, Inc., throughout its pleadings, was that the role of Kentucky Ridge Mining Co. in this transaction was that of an independent contractor. Norton Minerals, Inc. stresses that it was not the "employer" of the individuals working the Nortonville South No. 4 Mine; and therefore, it would be inappropriate and unjust for the Court to look to Norton Minerals, Inc. for the employees back wages. As previously stated by the Court, the action being taken at the present time is to maintain the status quo only. Interpretation of the "contract mining agreement" entered into between Norton Minerals, Inc. and Kentucky Ridge Mining Co., Inc., will be saved for another day. The Court's decision to grant the preliminary injunction did not turn on the issue as to whether Norton Minerals, Inc. was an "employer" under 29 U.S.C. § 203(d); however, the Court suggests that all parties might find *Walling v. Woodbine Coal Co.,* 64 F.Supp. 82 (E.D.Ky., 1945) interesting reading.

■ The Court, to a great extent, did base its decision to grant the injunctive relief requested pursuant to 29 U.S.C. § 217 by making a strict reading of 29 U.S.C. § 215(a)(1) and applying it to the facts in the case at bar. 29 U.S.C. § 215(a)(1); Prohibited Acts; prima facie evidence states:

(a) After the expiration of one hundred and twenty days from June 25, 1938, it shall be unlawful for any person—

(1) to transport, offer for transportation, ship, deliver, or sell in commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any employee was employed in violation of section 206 or section 207 of this title, or in violation of any regulation or order of the Administrator issued under section 214 of this title; except that no provision of this chapter shall impose any liability upon any common carrier for the transportation in commerce in the regular course of its business of any goods not produced by such common carrier, and no provision of this chapter shall excuse any common carrier from its obligation to accept any goods for transportation; and except that any such transportation, offer, shipment, delivery, or sale of such goods by a purchaser who acquired them in good *faith in reliance on written assurance from the producer that the goods were produced in compliance with the requirements of this chapter, and who acquired such goods for value without notice of any such violation, shall not be deemed unlawful;*

The Court has determined that Norton Minerals, Inc. is a "person" within the meaning of 29 U.S.C. §§ 203(a) and 215(a)(1). Based on the proof presented at the evidentiary hearing, the Court believes that Norton Minerals, Inc. had attempted and intended to transport, offer for transportation, ship, deliver or sell in commerce, or to ship, deliver or sell with knowledge that shipment or delivery or sale thereof in commerce was intended, goods in the production of which employees were employed in violation of Section 206 and Section 207 of Title 29 which in turn violated provisions of 29 U.S.C. § 215(a)(1).

■ Norton Minerals, Inc. contends that the coal involved in this action is excepted from operation of 29 U.S.C. § 215(a)(1) grounded on a reading of *Wirtz v. Powell Knitting Mills Co.,* 360 F.2d 730 (2nd Cir., 1966). In the *Wirtz* case, a secured creditor was enjoined from selling goods that were allegedly produced in violation of 29 U.S.C. § 215(a)(1). The temporary restraining order was dissolved at the District Court level and the Secretary of Labor appealed to the Second Circuit Court of Appeals. The Court of Appeals affirmed

the vacation of the temporary restraining order and the stay entered pending the appeal was vacated. This case has created an exception for secured creditors in possession of assets of a debtor that Congress had not deemed appropriate to include in 29 U.S.C. § 215(a)(1) at the time the *Wirtz* decision was rendered and has not been included to date. This case provides for an exception to the FLSA which is at odds with the interpretation given to the statute by the Supreme Court of the United States.

Plaintiff's Memorandum on the so-called "hot goods" provision filed with this Court on September 12, 1985, is particularly persuasive in regard to the legislative history surrounding the original FLSA. Norton Minerals, Inc. would have this Court believe that it is in the same position at this time as the secured creditor was in the *Wirtz* case. The Court admits that the circumstances are similar in nature. As indicated by the proof, Norton Minerals, Inc. is the owner of the coal and is in the possession of it. However; this Court feels that the exception to 29 U.S.C. § 215(a)(1) carved out in the *Wirtz* case for secured creditors circumvents the authority of Congress and flies in the face of *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941).

 Pages 3–6 of plaintiffs' Memorandum on the "hot goods" provision of the FLSA shows that both the Senate and the House of Representatives were clearly cognizant of placing restrictions on the sale or transportation of goods in interstate commerce where a person had a substantial proprietary interest in such goods and the person had no reason to believe that any substandard labor condition existed in the production of such goods. Both the House of Representatives and the Senate passed varying versions of the bill containing provisions addressing the "substantial proprietary interest" issue. The final bill, as adopted by Congress, provided for an absolute prohibition against the sale or shipment of "hot goods" except in the case of common carriers. The only modification of this provision as passed in 1938 was made by Congress in 1949. This second exception to 29 U.S.C. § 215(a)(1) involved purchasers who obtained the goods in good faith. It should be noted that this exception for purchasers contains various provisions that would prevent individuals from circumventing the "hot goods" provisions by claiming that the questionable goods were procured in an innocent manner. Congress has provided for only two exceptions to the "hot goods" provisions, those involving common carriers and innocent purchasers. This Court does not believe that the secured creditors of the *Wirtz* case or Norton Minerals, Inc., in this present action fall within these two exceptions. It is evident to this Court that Congress was mindful of "proprietary interest" such as these and intentionally chose not to create exceptions for them. As the Supreme Court stated in *Darby, supra*, 312 U.S. p. 115, 61 S.Ct. p. 457:

> The motive and purpose of a regulation of interstate commerce are matters for the legislative judgment upon the exercise of which the Constitution places no restriction and over which the courts are given no control.

Plaintiff states that an action to enforce 29 U.S.C. § 215(a)(1) is brought "not to compel the owner/contractor to pay the statutory wages or to put pressure on the defaulting producer to pay such wages, but to keep tainted goods from entering the channels of interstate commerce in competition with goods produced under the Act's standards." This rationale is based on the plaintiff's reading of *Darby, supra*, and this Court is inclined to agree. The Supreme Court's rationale as utilized in the *Darby* decision concerning the Fair Labor Standards Act has been incorporated into the Sixth Circuit, *Flame Coal Company* decision. The Sixth Circuit stated at page 560, 561 of the *Flame Coal Company* decision:

> The standard of public interest usually measures the propriety and need for injunctive relief. The public interest here is reflected by national policy expressed by Congress in the Act, and particularly

the admonitions found in section 2(a). *Walling v. J. Friedman & Co.,* 61 F.Supp. 325 (S.D.N.Y., 1945); *Mitchell v. Pidcock,* 299 F.2d 281, 287 (C.A. 5, 1962). Hardship is often cited as a determinative factor in equity. The District Court in this case gave primary consideration to hardships that would be imposed upon the defendants by compliance with the Act, observing that defendants could not successfully operate under its requirements. The United States Supreme Court in its early decision of *United States v. Darby,* 312 U.S. 100, 122, 61 S.Ct. 451, 461, 85 L.Ed. 609, notes that primary consideration is to be given, not to the individual defendant but to the "hardship" imposed upon a community by permissive existence of substandard labor conditions:

> " * * * the evils aimed at by the Act are the spread of substandard labor conditions through the use of the facilities of interstate commerce for competition by the goods so produced with those produced under the prescribed or better labor conditions * * *. The Act is thus directed at the suppression of a method or kind of competition in interstate commerce which it has in effect condemned as 'unfair,' * * *."

The Court in *Flame Coal, supra,* went on to state:

> . . . that the standard of public interest is not measured by the possible consequences which may befall one small business establishment when forced to comply with the law, but by the present or future existence of substandard labor conditions.

As indicated above, goods produced in violation of the Fair Labor Standards Act of 1938, as amended would unfairly compete with goods produced by complying employers. As pointed out by the plaintiff, a decision to prevent the shipment and selling of goods produced in violation of the Act will not only protect persons complying with the Act but also discourage the type of business arrangements which lead to minimum wage and overtime violations.

As stated in *Darby, supra,* interstate commerce is not a place for goods produced in violation of the Fair Labor Standards Act. In the case at bar, the employees are completely without fault. This Court must rely on the legislative history of this Act and the rationale of the *Darby* and *Flame Coal Company* cases and make the "wooden" reading of 29 U.S.C. § 215(a)(1) that District Judge Zavatt made reference to in the *Wirtz v. Powell Knitting Mills Co.* case. In light of the Congressional findings and declaration of policy contained in 29 U.S.C. § 202 in reference to the Fair Labor Standards Act of 1938, as amended, it would be a harsh result indeed, and, tantamount to unjust enrichment, if Norton Minerals, Inc. was to realize the benefit of the employees' labor which occurred during the time when the coal was being mined but the employees were not being paid in compliance with the Act. Norton Minerals, Inc., cannot claim that it has no responsibility to the employees on one hand and then demand the fruits of their illegal labor on the other.

After considering all equitable and legal arguments, the Court is compelled to grant plaintiff's Motion for Preliminary Injunction. If the goods were of such a nature to be easily stored, the Court would incorporate the language, en toto, of the Order granting the temporary restraining order into the preliminary injunction order. Unfortunately, this is not the case. Proof was presented at the evidentiary hearing that the coal in question could be considered to be "hot" within coal mining industry standards. This means that unless something is done soon there is a strong possibility that the coal will be very susceptible to spontaneous combustion.

It is also agreed by the parties to this controversy that the value and/or merchantability of the coal is decreasing daily. Thus, in view of the tremendous environmental ramifications that might ensue (not to mention the economic loss to all concerned) if the coal should be destroyed, it is imperative that the Court fashion a common sense solution to this predicament

without unjustly enriching any of the parties or attempting to decide the ultimate merits of the underlying contractual dispute. To be succinct, the only method which the Court has been able to think of in the two day period that has been available to it since the evidentiary hearing is, simply put, change the pile of coal into what will hopefully be a pile of money. The coal can then be sold as soon as possible for whatever price the market will presently bear and the proceeds can be paid into the Court until the case is decided on its merits. If any of the parties to this action have a better idea to accomplish the same end, I will be happy to entertain it, and, if convinced, will modify my ruling herein accordingly.

Therefore, the Court does hereby incorporate all substantive provisions of the Temporary Restraining Order entered on September 12, 1985, into this Order granting Plaintiff's Motion for Preliminary Injunction, subject to the following modifications:

1. The approximate 350 tons of washed underground coal located at the Don Bowles washer site is to be managed in the same manner as the coal located at the Nortonville South No. 4 Mine site and the Jim Smith washer site in keeping with the substantive provisions of the temporary restraining order granted by this Court on September 12, 1985. The restrictions and limitations placed on the movement of the coal located at the three (3) stated sites are to remain in full force and effect until the coal located at each of these three sites can be sold and disposed of in compliance with subsequent provisions of this order;

2. The Defendant, Norton Minerals, Inc. is hereby ordered to sell the coal stored at the following locations: (1) the approximate 2,500 tons of raw coal located at the Nortonville South No. 4 Mine site; (2) the approximate 281 tons of washed underground coal located at the Jim Smith processing facility and (3) the approximate 350 tons of washed underground coal located at the Don Bowles processing facility. This coal is to be processed and sold by Norton Minerals, Inc. within reasonable commercial and industry standards. Defendant, Norton Minerals, Inc. is to inform the Plaintiff, the United States Department of Labor and Defendants, Kentucky Ridge Mining Co., Inc. and Letcher White, no later than seventy-two (72) hours before a contract is to be executed involving the sale of the coal located at any of the above three locations. Any monies or funds derived from the sale of the coal located at the above three locations is to be paid directly to the Registry of the United States District Court with funds to be invested and remain in the custody of such until issuance of further order of this Court or until the final disposition of this case.

IT IS HEREBY FURTHER ORDERED that defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them, and all other parties who received actual notice of the order by personal service or otherwise during the pendency of this cause are enjoined and restrained: (1) from employing, suffering or permitting any of their employees engaged in commerce or in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce, within the meaning of the Fair Labor Standards Act of 1938, as amended (hereinafter referred to as the Act), to work, contrary to section 6 of the Act, for wages at a rate less than $3.35 an hour, or any wages at a rate less than that which may hereafter be established as the applicable minimum by the Act or any amendment thereto; (2) from employing, suffering or permitting any of their employees engaged in commerce or in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce, within the meaning of the Act, to work, contrary to section 7 of the Act, for a workweek longer than 40 hours without compensating the said employees for such excess hours of employment at a rate not less than one and one-half times the regular rate at which they are employed; and for such

other and further relief as may be necessary and appropriate to protect the plaintiff and the public interest which it is plaintiff's duty to protect from the immediate and irreparable injury or damage that will result from the movement in commerce of the goods produced by defendants' employees in violation of sections 6 and 7 of the Act, and the resulting spreading and perpetuating of unfair methods of competition in commerce and interference with the orderly and fair marketing of goods in commerce.

This Order granting Preliminary Injunction shall remain in effect pending further orders of this Court or until the final disposition of this case.