788 F.2d 1200
 27 Wage & Hour Cas. (BN 1033, 54 USLW 2549,
104 Lab.Cas. P 34,763
 William E. BROCK, Secretary of Labor, United States
Department of Labor, Plaintiff-Appellee,
v.
ELY GROUP, INC., Rockford Textile Mills, Inc., Ely & Walker,
Inc., Defendants,
Citicorp Industrial Credit, Inc., Defendant-Appellant.
 Nos. 85-5249, 85-5252.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 20, 1986.
Decided April 23, 1986.
 
 Francis X. Lilly, Theresa Ball, U.S. Dept. of Labor, Office of the Solicitor, Nashville, Tenn., Linda J. Pack (argued), Anne Fugett, Washington, D.C., for plaintiff-appellee.
 John W. Baker, Jr., Poore, Cox, Baker, Ray & Byrne, Knoxville, Tenn., Mark I. Wallach (argued), Thomas A. Cicarella, Mitchell G. Blair, Calfee, Halter & Griswold, Cleveland, Ohio, for defendant-appellant.
 Before ENGEL, KENNEDY and RYAN, Circuit Judges.
 CORNELIA G. KENNEDY, Circuit Judge.
 
 
 1
 These consolidated appeals present the question whether section 15(a)(1) of the Fair Labor Standards Act ("FLSA"), as amended, 29 U.S.C. Sec. 215(a)(1), applies to holders of collateral obtained pursuant to perfected security interests. The United States District Courts for the Eastern and Western Districts of Tennessee held that the FLSA applies to secured creditors. For the reasons set forth below, we affirm.
 
 
 2
 On December 14, 1983, defendant-appellant, Citicorp Industrial Credit, Inc. ("Citicorp"), and Qualitex Corporation, an earlier name for a group of companies consisting of Ely Group, Inc. ("Ely Group") and its subsidiaries, Rockford Textile Mills, Inc. ("Rockford") and Ely & Walker, Inc. ("Ely & Walker"), (collectively "Ely"), signed a financing agreement. Under this "zero balance"[1] financing arrangement, Citicorp agreed, in its discretion, to loan up to $11,000,000 to provide the general working capital for Ely. As security for the loans, Ely granted Citicorp a security interest in inventory, accounts receivable, and various other assets. Citicorp filed financing statements and other appropriate documentation to perfect its security interests so that Citicorp undisputably qualifies as a perfected secured creditor.
 
 
 3
 In accordance with the financing agreement, Ely submitted various daily, weekly, and monthly reports to Citicorp. In the fall of 1984, Ely started missing sales projections. Accordingly, the loan balance considerably exceeded projections. In January 1985, Ely stopped sending reports to Citicorp. A Citicorp field examination determined that Ely's computerized accounting system was not functioning properly. By early February 1985, Ely's loan balance had increased to approximately $9,500,000. February 8, 1985 was the last day Citicorp advanced any funds to Ely. On February 11, 1985, Citicorp ceased funding Ely's operations. Ely's employees, however, continued working until February 19, 1985, when Citicorp foreclosed, taking possession of the collateral, and Ely ceased operations.
 
 
 4
 Since Ely defaulted on its payroll, its employees did not receive any wages for various workweeks, dating from January 27, 1985 to February 19, 1985. Consequently, the goods that Ely produced during this period were produced in violation of the FLSA's minimum wage and overtime provisions.[2] Acting on information that Citicorp planned to ship the goods in interstate commerce, the Department of Labor brought these actions to enjoin the shipment of the goods under 29 U.S.C. Sec. 215(a)(1).
 
 
 5
 On March 15, 1985, Raymond J. Donovan, Secretary of Labor, United States Department of Labor,[3] filed a complaint and a motion for preliminary injunction and application for temporary restraining order in the United States District Court for the Eastern District of Tennessee, to enjoin Rockford, Ely Group, and Citicorp from placing goods allegedly produced in violation of the FLSA's minimum wage and overtime provisions in interstate commerce. The District Court denied the application for a temporary restraining order on March 15, 1985. After hearing arguments, the District Court granted the motion for preliminary injunction on March 22, 1985. Donovan v. Rockford Textile Mills, Inc., 608 F.Supp. 215 (E.D.Tenn.1985). Citicorp filed a notice of appeal from that ruling, which the Clerk of this Court docketed as No. 85-5249. On April 10, 1985, the District Court granted Citicorp's motion for a stay or suspension of injunction pending appeal.
 
 
 6
 On March 21, 1985, Ford B. Ford, Under Secretary of Labor, United States Department of Labor,[4] filed a related complaint and motion for preliminary injunction and application for temporary restraining order in the United States District Court for the Western District of Tennessee against Ely Group, Rockford, Ely & Walker, and Citicorp. The District Court, following a telephone conference with counsel, granted the temporary restraining order on March 22, 1985. Following a hearing, the District Court granted the motion for a preliminary injunction on March 27, 1985. Citicorp filed a notice of appeal, which the Clerk of this Court docketed as No. 85-5252. On March 28, 1985, the District Court denied Citicorp's motion to stay or suspend the injunction. Citicorp immediately filed a motion for a stay pending appeal in this Court, agreeing to pay the unpaid employees the statutorily required wages in the event that this Court concluded that 29 U.S.C. Sec. 215(a)(1) applies to Citicorp. This Court granted the requested stay on March 29, 1985.
 
 
 7
 Title 29 U.S.C. Sec. 215(a)(1),[5] the FLSA's "hot goods" provision, prohibits "any person" from shipping, delivering, or selling, in interstate commerce, goods that were produced in violation of FLSA's minimum wage and overtime provisions. Title 29 U.S.C. Sec. 203(a) defines "person" as "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons." Citicorp thus falls within the "plain meaning" of the statute. Citicorp, however, cites Church of the Holy Trinity v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892), for the proposition that this Court should look beyond the plain meaning of the statute. In Church of the Holy Trinity, the Supreme Court stated:
 
 
 8
 It is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.
 
 
 9
 Id. at 459, 12 S.Ct. at 512. See also United Steelworkers of America v. Weber, 443 U.S. 193, 201, 99 S.Ct. 2721, 2726, 61 L.Ed.2d 480, reh'g denied, 444 U.S. 889, 100 S.Ct. 193, 62 L.Ed.2d 125 (1979). Although courts may look behind the "plain meaning" of a statute when a literal construction would produce a nonsensical result or " 'bring about an end completely at variance with the purpose of the statute,' " id. at 202, 99 S.Ct. at 2726 (quoting United States v. Public Utilities Commission, 345 U.S. 295, 315, 73 S.Ct. 706, 97 L.Ed. 1020, reh'g denied, 345 U.S. 961, 73 S.Ct. 935, 97 L.Ed. 1380 (1953)), we conclude that applying the "hot goods" provision to secured creditors, in fact, furthers one purpose of the FLSA, which is to keep goods that were produced in violation of the FLSA out of interstate commerce.
 
 
 10
 In United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), the Supreme Court, after examining the declaration of policy in Sec. 2(a) of the FLSA, codified at 29 U.S.C. Sec. 202(a),[6] and the FLSA's legislative history, stated that the purpose of the FLSA
 
 
 11
 is to exclude from interstate commerce goods produced for the commerce and to prevent their production for interstate commerce, under conditions detrimental to the maintenance of the minimum standards of living necessary for health and general well-being; and to prevent the use of interstate commerce as the means of competition in the distribution of goods so produced, and as the means of spreading and perpetuating such substandard labor conditions among the workers of the several states.
 
 
 12
 Id. at 109-10, 61 S.Ct. at 455 (emphasis added). While discussing Sec. 15(a)(1) of the FLSA, the Court stated:
 
 
 13
 The motive and purpose of the present regulation are plainly to make effective the Congressional conception of public policy that interstate commerce should not be made the instrument of competition in the distribution of goods produced under substandard labor conditions, which competition is injurious to the commerce and to the states from and to which the commerce flows.
 
 
 14
 Id. at 115, 61 S.Ct. at 457. See also Roland Electric Co. v. Walling, 326 U.S. 657, 667-69, 66 S.Ct. 413, 417-19, 90 L.Ed. 383 (1946). Consequently, one of the reasons that Congress passed the FLSA was to exclude tainted goods from interstate commerce. Since Congress wanted to exclude goods that were produced in violation of the FLSA's minimum wage and overtime provisions from interstate commerce, prohibiting secured creditors, such as Citicorp, from shipping "hot goods" in interstate commerce furthers that Congressional intent. Accordingly, we follow the "plain language" of the statute and conclude that the phrase "any person" applies to Citicorp, as a secured creditor.[7]
 
 
 15
 In reaching this conclusion, we refuse to follow and reject the reasoning of the Second Circuit in Wirtz v. Powell Knitting Mills Company, Inc., 360 F.2d 730 (2d Cir.1966). In Powell Knitting Mills, the Second Circuit created a "judicial exception" to the FLSA by holding that FLSA Sec. 15 did not prohibit a factor, which had foreclosed its lien on an insolvent manufacturer, from selling the manufacturer's sweaters in interstate commerce on the ground that the manufacturer had produced the sweaters in violation of FLSA's minimum wage provisions. In Shultz v. Factors, Inc., 65 Lab.Cas. (CCH) p 32,487 (4th Cir.1971), the Fourth Circuit followed Powell Knitting Mills with little discussion but added an additional requirement "that there be no collusion between the manufacturer and his financier permitting the introduction into the market of goods produced in violation of the Act." See also Dunlop v. Sportsmaster, Inc., 77 Lab.Cas. (CCH) p 33,293 (E.D.Tenn.1975).
 
 
 16
 In Powell Knitting Mills, supra, the Secretary of Labor appealed from a district court order vacating a temporary restraining order that the district court had issued against a manufacturer of sweaters and the manufacturer's factor. The vacated order prohibited the factor from selling certain sweaters that the factor had acquired when it foreclosed its lien. The manufacturer had not paid eighty-six of its employees wages totaling $8,425 for the weeks ending February 18, February 25, and March 5, 1966. Beginning September 2, 1965, the factor had made approximately $700,000 in cash advances to the manufacturer, secured by liens on the manufacturer's inventory and equipment. The factor filed financing statements. On March 8, 1966, the manufacturer ceased operations and made an assignment for the benefit of creditors. The factor foreclosed and the Secretary of Labor brought the action to enjoin the sale of certain sweaters which had been produced during the time when the manufacturer had not paid wages.
 
 
 17
 The Second Circuit acknowledged that "[u]nder a literal, or, as Judge Zavatt called it, 'wooden' reading of the Act, the government would be entitled to an injunction." Id. at 732. The court of appeals recognized that one purpose of the FLSA's "hot goods" provision "was to prevent adverse competitive effects on those who comply with the Act." Id. at 733. The Second Circuit, however, stated that "[h]ere there can be no connection between the asserted violation and any effects on competition." Id. Although the court also recognized that another purpose of the "hot goods" provision was to assure that "wage earners would be paid," the court "[found] it hard to believe that Congress contemplated that the foreclosing creditor would have to pay the wage earners to avoid Sec. 15." Id. The court observed that "restraining the sale in interstate commerce (until the wage claims were paid) comes close to giving such wage claims a priority over secured creditors contrary to the scheme of the Bankruptcy Act." Id. See 11 U.S.C. Sec. 507. The court concluded:
 
 
 18
 The purpose of forcing payment of wages should not apply to the creditor who advanced funds long before the default in wages, and who merely forecloses his lien, at least where the value of the goods acquired does not exceed the debt left unpaid.
 
 
 19
 Id. Accordingly, the Second Circuit affirmed the district court order vacating the temporary restraining order.
 
 
 20
 Although we are reluctant to create an intercircuit conflict, we cannot agree with the Second Circuit's "judicially created exception."[8] The Second Circuit's reasoning conflicts with the Supreme Court's interpretation of the purposes of the FLSA in United States v. Darby, supra. Congress does not want "hot goods" to taint the channels of interstate commerce. Furthermore, the "hot goods" in this case will compete with goods produced in conformity with the FLSA's minimum wage and overtime provisions if Citicorp places the goods in interstate commerce. The FLSA protects manufacturers who comply with the minimum wage and overtime provisions by keeping "hot goods" out of interstate commerce.[9] Our holding does not change the priorities in bankruptcy. Citicorp "owns" the goods. The "hot goods" provision merely prevents Citicorp from shipping, delivering, or selling the goods in interstate commerce. Finally, the equities of the situation balance somewhere between Citicorp and the employees. Although Citicorp provided the capital and the materials for the production of the goods, that does not dictate that Citicorp should receive the benefits of the employees' labor during the three weeks which they worked on the goods but were not paid.
 
 
 21
 Congress has created only two exceptions--one for common carriers and one for good faith purchasers--to the broad scope of 29 U.S.C. Sec. 215(a)(1), which otherwise applies to "any person."[10] Citicorp definitely does not qualify as a common carrier. Citicorp has not raised the issue whether it could qualify as a good faith purchaser. We do observe, however, that although the extension of credit might qualify as a "purchase," Citicorp does not qualify as a "good faith purchaser" because Citicorp did not rely "on written assurance from the producer that the goods were produced in compliance with the requirements of [the FLSA]."[11] 29 U.S.C. Sec. 215(a)(1). We agree that Congress never directly considered the question whether the "hot goods" provision applies to secured creditors. Nevertheless, Citicorp should not be in a better position as a secured creditor, for which Congress has not created an exception, than as a "good faith purchaser," for which Congress specifically added an exception. Consequently, we conclude that Powell Knitting Mills created an exception for secured creditors that Congress did not and has not deemed appropriate. We, therefore, reject the reasoning in Powell Knitting Mills and hold that 29 U.S.C. Sec. 215(a)(1) applies to secured creditors.
 
 
 22
 Accordingly, we affirm the orders of the District Courts granting the preliminary injunctions enjoining Citicorp from placing the goods in interstate commerce.
 
 
 23
 ENGEL, Circuit Judge, dissenting.
 
 
 24
 I respectfully dissent. I would follow the lead of the Second Circuit in Wirtz v. Powell Knitting Mills, Inc., 360 F.2d 730 (2nd Cir.1966), and of the Fourth Circuit in Schultz v. Factors, Inc., 65 Lab.Cas. (CCH) p 32,487 (4th Cir.1971), and reverse.
 
 
 25
 If we were writing upon a clean slate, the majority opinion, in adopting a literal interpretation of the Fair Labor Standards Act, would have considerable appeal for the term "any person" is indeed broad and has been carefully defined by Congress, as the majority opinion observes. Beyond that, there is little to be said for the construction here mandated.
 
 
 26
 The evils foreseen and sought to be corrected by the Congress in enacting the "hot goods" provisions to the FLSA were twofold. Congress sought to improve working conditions by eliminating the incentive to manufacture goods at substandard wages and substandard hours; Congress also sought to prevent the injurious effect on trade that resulted when such goods were placed in interstate commerce in competition against goods that were manufactured in compliance with the FLSA. See United States v. Darby, 312 U.S. 100, 109-10, 61 S.Ct. 451, 455, 85 L.Ed. 609 (1941). To accomplish these goals, Congress took the profit and, hence, the incentive out of such practices by making it unlawful to place into interstate commerce goods that were manufactured in noncompliance with the minimum wage and hour provisions of the FLSA. This much is clear.
 
 
 27
 In my opinion, however, an employer's inability to pay wages at all due to insolvency was not the target of the Act, at least where, as here, the employer is not otherwise shown to have been in noncompliance with the minimum wage and hour requirements of the statute. The problem here does not seem to have been an employer's unwillingness to comply with the Act, but instead an inability to pay any wages at all due to financial distress. Characterizing the government's literal reading of the Act as "wooden," the Second Circuit observed in a similar situation, and correctly in my opinion, that "[o]ne purpose of making the sale illegal was to prevent the adverse competitive effects on those who comply with the Act. Here there can be no connection between the asserted violation and any effects on competition." Wirtz v. Powell Knitting Mills Co., 360 F.2d 730, 733 (2nd Cir.1966). It is just as reasonable to assume that perhaps one reason for the company's difficulty was its own previous compliance with the Act in the face of noncompliance by its competitors. No one has suggested that Congress, in passing the Fair Labor Standards Act, was seeking to tighten up the credit risks of producers of goods who may have otherwise been producing them in compliance with law but found themselves in financial difficulties. While imposing such risks upon lenders, as here, might hasten the demise of an insolvent company and thus avoid some loss to the wage earners who could not be paid at the end, the advantage of protecting otherwise valid security interests might equally have given the company precious time in which to recover from its straitened circumstances and thus to have provided employment at lawful wages longer.
 
 
 28
 The practical effect of the majority's decision is not to remove any tainted goods from competition for, as happened here, almost always the result will be that the goods are sold, if not in foreclosure, then in bankruptcy, or by other attaching creditors.[1] As here, the goods will go out in the market, but whether they are sold for competitively destructive prices will not depend on the cost of their production but upon the manner of their sale in any event. The real effect of the majority's interpretation is simply to create a judicial lien superior to the otherwise lawful lien which Citicorp possessed in the goods. In my view, this kind of pressure is the only motivation in the government in its present construction of the Act. Had it intended to create a federal lien law, Congress no doubt could have done so, but it did not. State laws governing creditors' rights, state laws protecting employees from non-payment of wages and bankruptcy laws generally, provide a great deal of relief for the protection of employees of defunct and insolvent corporations. It seems to me that in this special area of concern, the operation of these more traditional sources of law was intended by Congress to be sufficient. It is my opinion, therefore, that under a common sense application of section (15)(a)(1), Congress was looking instead at application of the Act in the course of the ongoing production of goods and not at the situation obtaining here and in the like cases in the Second and Fourth Circuits.
 
 
 29
 Even were I to agree with the majority here, I would still be reluctant to depart from a construction of the Act which has been in effect in the Second Circuit for twenty years and in the Fourth Circuit for nearly fifteen years. The need for a uniform national construction of the Act is obvious. Adherence to the existing interpretation, while expressing disagreement with it, could highlight the dispute should certiorari be sought, but without in the meanwhile creating a conflict in the circuits. While I do not argue in favor of any new rule respecting standards for avoiding intercircuit conflicts, we cannot be unaware that the resolution of intercircuit conflicts places a heavy burden upon the limited resources of the Supreme Court.[2] Until there is a resolution of the problem, I would prefer to accept the judgment of other circuits where they have uniformly held to one construction over a long period of time, at least where I do not have an abiding and serious disagreement with the construction already in effect.
 
 
 
 [1]
 Under a "zero balance" financing arrangement, the creditor transfers funds, on a daily or an "as needed" basis, into the debtor's "zero balance" bank account to meet the debtor's operating expenses. Accordingly, each day, after Ely's various banks informed Ely of the total amount of checks which had cleared, Ely personnel would notify Citicorp of the amount needed to cover those checks. Citicorp, in turn, would wire-transfer the necessary funds to Ely's bank accounts to fund Ely's disbursements, including payroll checks
 
 
 [2]
 FLSA Sec. 6, codified at 29 U.S.C. Sec. 206, requires employers to pay each employee minimum wages at the prescribed rate. FLSA Sec. 7, codified at 29 U.S.C. Sec. 207, requires employers to pay each employee one and one-half times the regular rate of pay for every hour in excess of forty hours that the employee works during a workweek
 
 
 [3]
 Pursuant to Fed.R.App.P. 43(c)(1), William E. Brock, Secretary of the United States Department of Labor, has replaced Raymond J. Donovan as a party in appeal No. 85-5249
 
 
 [4]
 In appeal No. 85-5252, William E. Brock has replaced Ford B. Ford as a party. See supra note 3
 
 
 [5]
 Title 29 U.S.C. Sec. 215 provides in pertinent part:
 (a) After the expiration of one hundred and twenty days from June 25, 1938, it shall be unlawful for any person--
 (1) to transport, offer for transportation, ship, deliver, or sell in commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any employee was employed in violation of section 206 or section 207 of this title, or in violation of any regulation or order of the Administrator issued under section 214 of this title; except that no provision of this chapter shall impose any liability upon any common carrier for the transportation in commerce in the regular course of its business of any goods not produced by such common carrier, and no provision of this chapter shall excuse any common carrier from its obligation to accept any goods for transportation; and except that any such transportation, offer, shipment, delivery, or sale of such goods by a purchaser who acquired them in good faith in reliance on written assurance from the producer that the goods were produced in compliance with the requirements of this chapter, and who acquired such goods for value without notice of any such violation, shall not be deemed unlawful
 ....
 
 
 [6]
 Title 29 U.S.C. Sec. 202(a) provides:
 The Congress finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce. That Congress further finds that the employment of persons in domestic service in households affects commerce.
 
 
 [7]
 We also note that in Dunlop v. Carriage Carpet Co., 548 F.2d 139, 144 (6th Cir.1977), while discussing the definition of the term "employee," this Court recognized that: "In interpreting provisions of the Fair Labor Standards Act the courts have construed the Act's definitions liberally to effectuate the broad policies and intentions of Congress." This Court stated that Congress used "key definitions of great breadth and generality" to accomplish its stated goals. Id. at 143
 
 
 [8]
 Although twenty years have elapsed since the Second Circuit's decision, we do not think that the "judicially created exception" has become so well-settled as to preclude this Court from reexamining the Second Circuit's reasoning. Contra Herman & MacLean v. Huddleston, 459 U.S. 375, 380 n. 10, 103 S.Ct. 683, 686 n. 10, 74 L.Ed.2d 548 (1983) (courts had consistently recognized an implied cause of action under Rule 10b-5 for more than thirty-five years). Even though the Fourth Circuit and the United States District Court for the Eastern District of Tennessee, until one of the cases on appeal, followed Powell Knitting Mills, the two District Courts below and the United States District Court for the Western District of Kentucky have refused to follow the "judicially created exception." See also Brock v. Kentucky Ridge Mining Co., Inc., 635 F.Supp. 444 (W.D.Ky. 1985)
 
 
 [9]
 The dissenting opinion correctly notes that Citicorp has already sold the goods in question on the condition that it place the proceeds in escrow pending final resolution of this controversy. The dissent claims that "[t]he practical effect of the majority's decision is not to remove any tainted goods from competition...." Citicorp, however, has effectively removed the "taint" from the goods by agreeing to pay the statutorily required wages if this Court holds that 29 U.S.C. Sec. 15(a)(1) applies to secured creditors
 
 
 [10]
 We note that the legislative history of the FLSA does not conclusively indicate whether Congress intended the "hot goods" provision to apply to secured creditors. Although the Senate Bill contained a provision that would have allowed a Labor Standards Board to exempt goods from the prohibition against interstate shipment if every person having a "substantial proprietary interest" in the goods could satisfy the Board that they had no reason to believe that any substandard condition existed in the production of the goods, the provision appeared in a reparation section. See H.Rep. No. 2738, 75th Cong., 3d Sess. 20 (1938). The exemption accordingly required that every employer having a proprietary interest in the goods who failed to maintain the required wage or hour standard provide for the payment of reparation. The Senate Bill contained a separate section prohibiting the shipment of goods produced under substandard labor conditions. Id. at 17. Another section in the Senate Bill contained an exception to the prohibition against the interstate shipment of "substandard goods" for common carriers. Id. at 20. The House Amendment also prohibited the shipment of "substandard goods" in interstate commerce but also contained an exception for common carriers in the regular course of business. Id. at 26. The Conference Agreement adopted a version that closely followed the corresponding section of the House Amendment. Id. at 33
 In the Fair Labor Standards Amendments of 1949, Congress added an exception for "good faith purchasers" of goods produced in violation of the FLSA. The Conference Report stated:
 This [exception] protects an innocent purchaser from an unwitting violation and also protects him from having goods which he has purchased in good faith ordered to be withheld from shipment in commerce by a "hot goods" injunction. An affirmative duty is imposed upon him to assure himself that the goods in question were produced in compliance with the act, and he must have secured written assurance to that effect from the producer of the goods. The requirement that he must have made the purchase in good faith is comparable to similar requirements imposed on purchasers in other fields of law, and is to be subjected to the test of what a reasonable, prudent man, acting with due diligence, would have done in the circumstances.
 Conf.R. No. 1453, 81st Cong., 1st Sess., reprinted in 1949 U.S.Code Cong. & Ad.News 2241, 2271.
 
 
 [11]
 Although the predecessor of Ely warranted, in the financing agreement, that it would "[c]omply with all laws, statutes, regulations and ordinances of any governmental entity," that representation does not amount to written assurance "that the goods were produced in compliance with the requirements of [the FLSA]."
 
 
 [1]
 The record discloses that an agreement was made in the district court whereby the goods were in fact released on condition that Citicorp place the proceeds of the sale in a separate account pending final resolution of this matter. Citicorp was therefore free and expected to dispose of these goods and, thus, to introduce them into interstate commerce to compete against those goods that were presumably manufactured in compliance with the Act
 
 
 [2]
 See generally Burger, The Time is Now for the Intercircuit Panel, 71 A.B.A.J. 86 (1985); Burger, Annual Report on the State of the Judiciary, 69 A.B.A.J. 442 (1983); Carrington, Crowded Dockets and the Courts of Appeals: The Threat to the Function of Review and the National Law, 82 Harv.L.Rev. 542, 596 (1969); see also Wallace, Nature and Extent of Intercircuit Conflicts: A Solution Needed for a Mountain or a Molehill?, 71 Calif.L.Rev. 913 (1983)