Ford B. **FORD**, Under Secretary of Labor, United States Department of Labor, Plaintiff,

v.

**ELY GROUP, INC.**, Rockford Textile Mills, Inc., Ely & Walker, Inc., and Citicorp Industrial Credit, Inc., Defendants.

No. 85–2276H.

United States District Court, W.D. Tennessee W.D.

March 28, 1985.

Theresa Ball, U.S. Dept. of Labor, Solicitors Office, Nashville, Tenn., for plaintiff.

Mark I. Wallach, Thomas A. Cicarella, Mitchell G. Blair, Calfee, Halter & Griswold, Cleveland, Ohio, Ellen B. Vergos, David J. Sneed, Waring, Cox, Memphis, Tenn., Thornton W. Morris, Atlanta, Ga., Cornelia A. Clark, Farris, Warfield & Kanady, Nashville, Tenn., for defendants.

## ORDER GRANTING PRELIMINARY INJUNCTION

HORTON, District Judge.

On March 21, 1985, this Court entered a temporary restraining order, upon application of the Under Secretary of Labor, United States Department of Labor, enjoining the defendants, Ely Group, Inc., Rockford Textile Mills, Inc., Ely & Walker, Inc., and Citicorp Industrial Credit, Inc., from transferring, releasing, disposing of or attempting to dispose of, liquidating, divesting, moving, allowing the removal of or attempt to remove from defendants' establishment in Memphis, Tennessee, or elsewhere, any raw products, materials, supplies, partially completed goods, finished goods, fixtures, machinery or other goods (as defined by Section 3(i) of the FLSA) then on said premises or elsewhere, and from disposing of or attempting to dispose of any other assets pending a hearing on plaintiff's application for a preliminary injunction.

The Court conducted a hearing for a preliminary injunction, upon notice, on March 26, 1985, as specified in the temporary restraining order.

After a full hearing, the Court finds the following facts:

1) Ely Group Inc., a corporation doing business in Memphis, Tennessee, has been engaged in the manufacture, warehousing and distribution of hosiery, apparel, and other textiles and goods through its subsidiaries Rockford Textiles, Inc., and Ely & Walker, Inc.

2) Citicorp Industrial Credit, Inc. (Citicorp) has been engaged in the business of funding the operational needs of Ely Group, Inc. and its subsidiaries, pursuant to a Financing Agreement, as amended, dated December 14, 1983 (Ex. 2).

3) Citicorp funded on a daily basis a zero balance bank account for Ely Group, Inc. Ely Group, Inc., (Ely) was requested to notify Citicorp each day as they obtained information from the banks that checks had cleared and Citicorp transferred funds by wire daily to meet the banking needs of Ely Group, Inc. Payments by customers of Ely Group, Inc., were made to Citicorp through a lock box system, a control system insuring that the money owed by Ely Group would flow back to the creditor Citicorp. While there is no evidence of collusion between officials of Citicorp and Ely Group, Inc., the evidence does show that Citicorp knew it was funding the payroll of Ely Group, Inc., and when this funding ceased Ely could not meet its payroll obligations to its employees.

4) Citicorp perfected its security interest in all inventory, accounts receivable, and other assets of Ely Group, Inc. by filing for recordation all appropriate documents in the proper counties of Tennessee and with the Secretary of State for the State of Tennessee. Citicorp is a secured creditor of Ely Group, Inc., and is fully perfected upon the assets of Ely Group, Inc., (Ex. 4).

5) Citicorp conducted an ongoing monitoring system through auditors and/or field examiners who verified collateral upon which it made cash advances to Ely Group, Inc. These representatives of Citi-

corp conducted this monitoring on the premises of Ely Group, Inc., and its subsidiaries. They checked inventory, sales, credits and purchases to see if they were consistent with figures supplied to it by Ely Group, Inc. While these representatives did not verify wages paid to employees, they did check to see if Ely Group, Inc. paid all employee taxes.

6) During the Fall of 1984, Ely Group, Inc., started missing its sales projections. In February of 1985, the loan balance was about $9,500,000 and Ely Group, Inc., was losing money. Citicorp was concerned with why the inventory of Ely Group, Inc., was dropping precipitously while no sales were occurring.

7) On February 8, 1985, Citicorp delivered a letter to Ely Group, Inc., informing Ely it would no longer make cash advances and all loans due Citicorp by Ely Group, Inc., were due and payable.

8) On February 11, 1985, Ely Group, Inc., requested time to consult with a crisis management firm. This approach to the problems of Ely Group, Inc., did not prove worthwhile. Ely Group, Inc., was not generating cash but was actually consuming cash at the rate of $500,000.00 per week.

9) On February 19, 1985, Citicorp took possession of all assets of Ely Group, Inc., and the company ceased doing business on that date. Citicorp claims it is in a deficit position of $1,500,000 and is paying for warehousing of inventory it seized, guard service, insurance and utility bills. Citicorp has collected $1,200,000 in receivables at the Memphis location.

10) Hourly, bi-weekly and monthly employees have not been paid for their work which went into the manufacture and production of goods seized by Citicorp.

11) Approximately 300 hourly pay and bi-weekly pay employees at the Paragould, Arkansas, plant have not been paid for their work for a period of two to three weeks. Approximately 300 employees at the Rockford Textile Mills plant have not been paid for their work. In addition hourly, bi-weekly, monthly pay and executive employees who worked in the Memphis offices and warehouse remain unpaid.

12) While Citicorp argued that the entry of a preliminary injunction in this case will affect employment opportunities for Memphis workers at Ely Group, Inc., the evidence shows no future employment opportunities are contemplated for the Memphis operations of Ely Group, Inc. Instead, the proof shows Citicorp has negotiated a possible sale of a major part of the assets of Ely Group, Inc., and plans to transfer inventory it has foreclosed upon from the Memphis warehouse facilities to Nashville, Tennessee and that transfer is imminent.

13) Representatives of the United States Department of Labor informed an attorney for Citicorp that goods had been produced by employees of Ely Group, Inc., and its subsidiaries, in violation of the Fair Labor Standards Act. Specifically, the Labor Department took the position these employees had not been paid according to the Act and the goods manufactured and produced during the period when employees were not paid could not be introduced into interstate commerce. The evidence is that Citicorp has shipped goods in interstate commerce since the facilities and subsidiaries of Ely Group, Inc., ceased operations and did so with knowledge that employees of the various entities had not been paid. Specifically there have been shipments to Walmart and Sears Roebuck & Company stores since February 19, 1985, of 1800 dozen shirts valued in excess of $100,000 and 2000 dozen shirts valued at about $7.60 per shirt.

14) Citicorp released a news item from its New York offices stating the inventory it had foreclosed upon pursuant to its perfected security interest would be sold to recoup some of its losses in its dealings with Ely Group, Inc., and subsidiaries.

The central issue in this case as stated by Citicorp is whether Section 15(a)(1) of the Fair Labor Standards Act applies to a secured creditor in possession who is fully perfected with top lien rights under state law. Can that secured creditor be forced by the Fair Labor Standards Act to take a back seat to unpaid workers despite its

secured status? Stated another way, the issue is whether Citicorp, a secured creditor, who has forclosed upon the assets of its debtor, Ely Group, Inc. and its subsidiaries, and is in possession of those assets, a substantial part of which were produced by unpaid workers allegedly in violation of the Fair Labor Standards Act, can be enjoined pursuant to Section 217, Title 29, United States Code from violating Section 215, Title 29, United States Code.

This Court rules Citicorp is subject to be enjoined and the Court finds it should grant a preliminary injunction enjoining Citicorp from disposing of any assets in its possession which were manufactured or produced by employees of Ely Group, Inc., and its subsidiaries, or any receivables collected for the sale of goods manufactured, produced or processed during the time workers were unpaid in violation of the Fair Labor Standards Act (FLSA).

Citicorp relies upon *Wirtz v. Powell Knitting Mills Co.*, 360 F.2d 730 (2d Cir. 1966), *Schultz v. Factors, Inc.*, 65 CCH Lab.Cas. 32, 487 (4th Cir.1971, and *Dunlop v Sports-Master, Inc.*, 77 Lab.Cas. 33, 293 (E.D.Tenn.1975). These cases hold the "hot goods" provision of FLSA does not apply to a secured creditor in possession of the assets of a debtor resulting from default of payment of loans previously advanced.

The Under Secretary of Labor maintains these cases apply an exception to the Fair Labor Standards Act (FLSA) which is not consistent with that Act as interpreted by the Supreme Court of the United States. The position of the Department of Labor, as stated in its brief filed March 21, 1985, is as follows:

The so-called "hot goods" provision of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, is contained in § 15(a)(1) of the Act, 29 U.S.C. § 215(a)(1):

After the expiration of one hundred and twenty days from the date of enactment of this Act, it shall be unlawful for any person—

(1) to transport, offer for transportation, ship, deliver, or sell in commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any employee was employed in violation of section 6 or section 7, or in violation of any regualtion or order of the Secretary of Labor issued under section 14; except that no provision of this Act shall impose any liability upon any common carrier for the transportation in commerce in the regular course of its business of any goods not produced by such common carrier, and no provision of this Act shall excuse any common carrier from its obligation to accept any. goods. for transportation; and except that any such transportation, offer, shipment, delivery, or sale of such goods by a purchaser who acquired them in good faith in reliance on written assurance from the producer that the goods were produced in compliance with the requirements of the Act, and who acquired such goods for value without notice of any such violation, shall not be deemed lawful.

The basic purpose of the § 15(a)(1) prohibition, as the Supreme Court pointed out in *United States v. Darby*, 312 U.S. 100, 109–110, 61 S.Ct. 451, 454–55, 85 L.Ed. 609, "is to exclude from interstate commerce" goods produced under substandard labor conditions, which would compete unfairly with goods produced by complying employers, and which in their total effect might force complying employers out of business (*id.*, at 122, 61 S.Ct. at 461). This "evil" is the same whether the goods are sold and shipped in commerce by the manufacturer or by a foreclosing creditor. It is also immaterial that the tainted or "hot goods" held by the creditor are limited to the quantity in being at the time of the foreclosure. Thus, as the Supreme Court also pointed out in *Darby, supra*, "competition by a small part may affect the whole and ... the total effect of the competition of many small producers may be great" *Id.* at 123, 61 S.Ct. at 461. An action to enforce the § 15(a)(1) prohibition is brought, not to

compel the foreclosing creditor to pay the statutory wages or to put pressure on the defaulting producer to pay such wages, but to keep tainted goods from entering the channels of interstate commerce in competition with goods produced under the Act's standards.

Moreover, if foreclosing creditors are free to ship and sell tainted goods across state lines, the temptation to overextend credit to marginal producers is strong, as is the likelihood that such producers will become unable to meet their payrolls. The reason for this is that finance companies and institutions stand to reap financial gain by keeping such producers in business. A holding by this Court that creditors may not ship and sell in interstate commerce goods produced in violation of the Act will not only protect complying manufacturers from the unfair competition of such tainted goods, but, we submit, it will also discourage the type of commercial financing which leads to minimum wage and overtime violations.

This Court agrees with the position taken by the Department of Labor.

Section 15(a)(1) provides only two exceptions:

no provision of this chapter shall impose any liability upon any common carrier for the transportation in commerce in the regular course of its business of any goods not produced by such common carrier, and no provision of this chapter shall excuse any common carrier from its obligation to accept any goods for transportation; and ... any such transportation, offer, shipment, delivery, or sale of such goods by a purchaser who acquired them in good faith in reliance on written assurance from the producer that the goods were produced in compliance with the requirements of this chapter, and who acquired such goods for value without notice of any such violation, shall not be deemed unlawful

The Court finds neither applicable in the present case.

Further this Court concurs in the opinion of the United States District Court, Eastern District of Tennessee, Winchester Division, filed March 22, 1985. In that opinion, Judge Thomas G. Hull stated:

"No exception was specifically made by Congress in 29 U.S.C. § 215(a)(1) for a foreclosing creditor, and this Court refuses to read such an exception into the Act.

Secured creditors such as Citicorp take their security subject to the laws of the land. If such creditors have a security interest in property which was produced in violation of the provisions of the Fair Labor Standards Act, they retain their security interest, however, that interest is subject to the provisions of the Act. The Fair Labor Standards Act was enacted for the benefit and protection of the laborers and for the benefit and protection of employers who comply with the Act. As previously noted, goods produced in violation of the Act would compete unfairly with goods produced by complying employers. The market should not be flooded with goods produced in violation of the Act. In this instance, both the employees and the secured creditor are innocent parties, the culprit being the manufacturer. However, in light of the purposes of the Act, it would be an unjust and harsh result for the creditor to get the benefit of the labor of the employees during the period of time they produced goods and were not paid as provided by the Act; a benefit which the creditor would not have without the employees labor."

Based upon all the evidence in the entire record in this case, the Court finds Citicorp Industrial Credit, Inc., a secured creditor in possession, imminently plans to ship goods in interstate commerce which were produced by employees of Ely Group, Inc., and its subsidiaries, Rockford Textile Mills, Inc., and Ely & Walker, Inc., and/or others, which were produced in violation of the Fair Labor Standards Act, 29 U.S.C. § 206, as amended, and the movement of these goods will result in the immediate and irreparable injury or damage to plaintiff and the public interest in that such shipment and movement of goods will make use of the channels and instrumentalities of inter-

state commerce to spread and perpetuate an unfair method of competition and interfere with the orderly and fair marketing of goods in commerce.

Plaintiff's application for a Preliminary Injunction is hereby ORDERED granted. It is further

ORDERED that defendants, their officers, agents, servants, employees and all persons in active concert or participation with them and all other persons who receive actual notice of this order by personal service or otherwise be, and they hereby are, enjoined from transferring, releasing, disposing of or attempting to dispose of, liquidating, divesting, moving, allowing the removal of or attempt to remove from defendants' establishment in Memphis, Tennessee, or elsewhere, any raw products, materials, supplies, partially completed goods, finished goods, or other goods now on said premises or elsewhere, and from disposing of or attempting to dispose of any other assets which were produced during the period of time when employees of Ely Group, Inc., and its subsidiaries, were not paid for their labor as required by the Fair Labor Standards Act, specifically February 3, 1985, through February 19, 1985. It is further

ORDERED that this injunction covers accounts receivable collected by defendant Citicorp, and or any other defendant, on any goods produced by Ely Group, Inc., and its subsidiaries, during the same period of time, February 3, 1985, through February 19, 1985.

This order granting Preliminary Injunction shall remain in effect pending further orders of this Court or until the final disposition of this case.