## CITICORP INDUSTRIAL CREDIT, INC. *v.* BROCK, SECRETARY OF LABOR

No. 86–88.   Argued April 20, 1987—Decided June 22, 1987

MARSHALL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, BLACKMUN, POWELL, O'CONNOR, and SCALIA, JJ., joined. SCALIA, J., filed a concurring opinion, *post*, p. 40. STEVENS, J., filed a dissenting opinion, in which WHITE, J., joined, *post*, p. 40.

*Rex E. Lee* argued the cause for petitioner. With him on the briefs were *George W. Jones, Jr.*, and *A. Bruce Schimberg.*

*Charles A. Rothfeld* argued the cause for respondent. With him on the brief were *Solicitor General Fried, Deputy Solicitor General Cohen, George R. Salem, Allen H. Feldman,* and *Steven J. Mandel.**

JUSTICE MARSHALL delivered the opinion of the Court.

Section 15(a)(1) of the Fair Labor Standards Act of 1938, 52 Stat. 1068, prohibits "any person" from introducing into

---

*\*Mark I. Wallach, Thomas A. Cicarella,* and *Mitchell G. Blair* filed a brief for the National Commercial Finance Association as *amicus curiae* urging reversal.

*George Kaufmann* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

interstate commerce goods produced in violation of the minimum wage or overtime provisions of the Act. The question in this case is whether § 15(a)(1) applies to holders of collateral obtained pursuant to a security agreement.

## I

In 1983, petitioner entered into a financing agreement with Qualitex Corporation, a clothing manufacturer and the corporate predecessor to Ely Group, Inc., and its subsidiaries Rockford Textile Mills, Inc., and Ely & Walker, Inc. (collectively Ely). Under the terms of the financing arrangement, petitioner agreed to loan up to $11 million to provide working capital for Ely. In return, Ely granted petitioner a security interest in inventory, accounts receivable, and other assets. Petitioner perfected its security interest under applicable state law.

The financing agreement imposed various reporting requirements on Ely, including the submission to petitioner of a weekly schedule of inventory, a monthly balance sheet and income statement, and reports of accounts receivable. Petitioner also monitored the collateral upon which it made cash advances through a system of audits and on-site inspections. In the fall of 1984, Ely's sales began to fall below projections, and the balance on the loan began to increase, reaching over $9.5 million by February 1985. Ely stopped reporting to petitioner in January 1985. On February 8, petitioner stopped advancing funds and demanded payment in full. At the request of Ely's management, however, petitioner did not immediately foreclose. It gave Ely an opportunity to devise a plan for continuing its operations, but Ely was unable to do so. Petitioner waited until February 19, at which time it took possession of the collateral, including Ely's inventory of finished goods.

Ely's employees continued to work until February 19, when Ely ceased all operations and closed its manufacturing facilities. Because Ely defaulted on its payroll, the employ-

ees did not receive any wages for pay periods between January 27 and February 19. The Department of Labor concluded that the items manufactured during these times were produced in violation of §§ 6 and 7 of the Fair Labor Standards Act of 1938 (FLSA), 29 U. S. C. §§ 206 and 207, and that under § 15(a)(1), they were "hot goods" that could not be introduced into interstate commerce.[1] Acting on information that petitioner intended to transport these goods in interstate commerce, the Secretary of Labor sought to enjoin shipment.

In an action filed in the United States District Court for the Eastern District of Tennessee, the Secretary moved for a preliminary injunction and sought a temporary restraining order to prohibit Ely and petitioner from placing the goods in interstate commerce. The District Court denied the application for a temporary restraining order but, after a hearing, granted the Secretary's motion for a preliminary injunction. *Donovan* v. *Rockford Textile Mills, Inc.*, 608 F. Supp. 215 (1985). The Under Secretary of Labor then filed another complaint against Ely and petitioner, this time in the United

---

[1] Section 15(a)(1) of the FLSA, codified at 29 U. S. C. § 215(a), provides in relevant part:

"(a) [I]t shall be unlawful for any person—

"(1) to transport, offer for transportation, ship, deliver, or sell in commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any employee was employed in violation of section 206 or section 207 of this title, or in violation of any regulation or order of the Secretary issued under section 214 of this title; except that no provision of this chapter shall impose any liability upon any common carrier for the transportation in commerce in the regular course of its business of any goods not produced by such common carrier, and no provision of this chapter shall excuse any common carrier from its obligation to accept any goods for transportation; and except that any such transportation, offer, shipment, delivery, or sale of such goods by a purchaser who acquired them in good faith in reliance on written assurance from the producer that the goods were produced in compliance with the requirements of this chapter, and who acquired such goods for value without notice of any such violation, shall not be deemed unlawful."

States District Court for the Western District of Tennessee. This complaint was also accompanied by a motion for a preliminary injunction and application for a temporary restraining order. The District Court granted the temporary restraining order and later granted the Under Secretary's motion for a preliminary injunction. *Ford* v. *Ely Group, Inc.*, 621 F. Supp. 22 (1985).

Both District Courts held that § 15(a)(1), which makes it unlawful for any person to ship "hot goods" in interstate commerce, prohibited not only Ely but also petitioner from transporting or selling items produced by employees who had not been paid in conformity with §§ 6 and 7 of the FLSA. They found this reading of § 15(a)(1) consistent with congressional intent to exclude from interstate commerce goods produced under substandard labor conditions. 608 F. Supp., at 217; 621 F. Supp., at 25–26. The courts concluded that

> " 'in light of the purposes of the Act, it would be an unjust and harsh result for the creditor to get the benefit of the labor of the employees during the period of time they produced goods and were not paid as provided by the Act; a benefit which the creditor would not have without the employees['] labor.' " *Id.*, at 26 (quoting 608 F. Supp., at 217).[2]

The two cases were consolidated on appeal. The United States Court of Appeals for the Sixth Circuit affirmed, one judge dissenting. *Brock* v. *Ely Group, Inc.*, 788 F. 2d 1200

---

[2] The District Court for the Eastern District of Tennessee granted petitioner's motion for a stay of the preliminary injunction pending appeal. The stay permitted the delivery and sale of Ely's inventory, on the condition that petitioner place the proceeds in a separate interest-bearing account to be used to pay the wages of Ely's former employees in the event that, on appeal, § 15(a)(1) was held to apply to petitioner. The District Court in the Western District denied a similar motion for a stay, but the Court of Appeals granted a stay on the same conditions. The Court of Appeals subsequently modified its order to permit petitioner to withdraw all but $1.5 million from the account.

(1986). Following the plain language of § 15(a)(1), the majority concluded that "any person" as used in that section applies to secured creditors. *Id.*, at 1202–1203. Like the District Courts, it found this result consistent with the purpose of the FLSA: to exclude tainted goods from interstate commerce. *Id.*, at 1203. The Court of Appeals rejected the reasoning of the Second Circuit in *Wirtz* v. *Powell Knitting Mills Co.*, 360 F. 2d 730 (1966), which had held § 15(a)(1) inapplicable to secured creditors who take possession of goods produced in violation of the FLSA. 788 F. 2d, at 1204–1205. The Sixth Circuit noted that Congress created only two exceptions to the broad scope of § 15(a)(1), one for common carriers and one for good faith purchasers, *id.*, at 1205, and concluded that "*Powell Knitting Mills* created an exception for secured creditors that Congress did not and has not deemed appropriate." *Id.*, at 1206. The dissenting judge would have followed *Powell Knitting Mills*. He maintained that in enacting the "hot goods" provision, Congress was concerned with violations of the Act occurring in the course of the ongoing production of goods by a solvent manufacturer, not, as here, by an insolvent corporation that has ceased operations. *Id.*, at 1207.

We granted certiorari to resolve this conflict among the Circuits.[3] 479 U. S. 929 (1986). We now affirm.

## II

### A

The FLSA mandates the payment of minimum wage and overtime compensation to covered employees. Section 6(a) provides that every employer, as defined in the Act, "shall

---

[3] In *Shultz* v. *Factors, Inc.*, 65 CCH LC ¶ 32,487 (1971), the Fourth Circuit adopted the reasoning of the Second Circuit in *Wirtz* v. *Powell Knitting Mills Co.*, 360 F. 2d 730 (1966), but added the requirement "that there be no collusion between the manufacturer and his financier permitting the introduction into the market of goods produced in violation of the Act." See also *Dunlop* v. *Sportsmaster, Inc.*, 77 CCH LC ¶ 33,293 (ED Tenn. 1975) (following *Powell Knitting Mills*).

pay to each of his employees" wages not less than the specified minimum rate; § 7(a)(1) prohibits employment of any employee in excess of 40 hours per week "unless such employee receives compensation" at a rate of not less than one and one-half times the employee's regular rate. Petitioner does not contest the lower courts' findings that Ely failed to pay its employees *at all* for several weeks immediately preceding the plant closings. Consequently, we conclude, as did the Court of Appeals, that the goods produced during this period were manufactured in violation of § 6 and/or § 7 of the FLSA and are "hot goods" for the purposes of § 15(a)(1).[4] See 788 F. 2d, at 1201.

Section 15(a)(1) prohibits "any person" from introducing goods produced in violation of § 6 or § 7 of the FLSA into interstate commerce. Section 3(a) defines "person" as "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons." 29 U. S. C. § 203(a). As a corporate entity, petitioner clearly falls within the plain language of the statute. Section 15(a)(1) contains two exemptions to the general prohibition on interstate shipment of "hot goods." The first, enacted as part of the original FLSA, exempts common carriers from the prohibition on transportation of such goods. The second, added in 1949, exempts a purchaser who acquired the goods

---

[4] Petitioner appears to suggest that Ely's failure to pay its employees did not violate the minimum wage and overtime provisions of the FLSA because §§ 6 and 7 "address wage rates, rather than the problem of non-payment due to insolvency." Brief for Petitioner 16. This ignores the plain language of the Act, which is not limited to ongoing concerns and makes no exception for employers who are financially or otherwise unable to comply with §§ 6 and 7. The proposition that an employer complies with the FLSA so long as its promised wage rates equal or exceed the statutory minimum, regardless of whether employees actually receive any compensation, would render illusory the Act's protections. As this case demonstrates, such a rule would also encourage financially unstable employers to obtain labor when their financial condition indicates that they are unlikely to be able to pay for it.

for value, without notice of any violation, and "in good faith in reliance on written assurance from the producer that the goods were produced in compliance with the requirements" of the Act.

Petitioner does not claim to come within either statutory exemption. Rather, it argues that the exemptions reflect congressional intent to limit application of the "hot goods" provision to culpable parties, and therefore, "innocent" secured creditors should not be subject to the Act.[5] We disagree. Although §§ 6 and 7 only require "employers" to pay minimum wage and overtime, § 15(a)(1) refers to "any person," not "any employer." Congress limited *other* provisions of the FLSA as petitioner suggests,[6] which indicates that its failure to do so in § 15(a)(1) was not inadvertent. That Congress identified only two narrow categories of "innocent" persons who were not subject to the "hot goods" provision suggests that all other persons, innocent or not, *are* subject to § 15(a)(1).[7] We find no indication that Congress actually

---

[5] Although it found no evidence of collusion between petitioner and Ely, the United States District Court for the Western District of Tennessee found that petitioner knew that it was funding Ely's payroll and that when its funding ceased, Ely would be unable to meet its payroll obligations. *Ford* v. *Ely Group, Inc.*, 621 F. Supp. 22, 23 (1985).

[6] For example, § 12(a)'s prohibitions against child labor are enforceable only against "a producer, manufacturer or dealer," 29 U. S. C. § 212(a). See § 15(a)(4), 29 U. S. C. § 215(a)(4). Under § 16(b), backpay may be sought only from an "employer." 29 U. S. C. § 216(b). And § 16(a) imposes criminal liability only for willful violations of the Act. 29 U. S. C. § 216(a).

[7] Congress' motive for exempting common carriers does not appear to have been concern for nonculpable parties, as petitioner suggests, but a desire

"to prevent a case involving the constitutionality of the act from arising in a suit between a shipper and a common carrier, to which the Government was not a party, inasmuch as the common carrier has no interest in the issue of constitutionality, but only in its obligation to accept goods for transportation." H. R. Rep. No. 2182, 75th Cong., 3d Sess., 14 (1938).

considered application of the "hot goods" provision to secured creditors when it enacted the FLSA. By claiming a general exemption for creditors, without any duty to ascertain compliance with the FLSA, petitioner is asking us to put creditors in a better position than good-faith purchasers, for whom Congress specifically added an exemption.

In the past, the Court has refused "[t]o extend an exemption to other than those plainly and unmistakably within [the FLSA's] terms and spirit." *A. H. Phillips, Inc.* v. *Walling*, 324 U. S. 490, 493 (1945). Similarly, where the FLSA provides exemptions "in detail and with particularity," we have found this to preclude "enlargement by implication." *Addison* v. *Holly Hill Fruit Products, Inc.*, 322 U. S. 607, 617 (1944). See also *Powell* v. *United States Cartridge Co.*, 339 U. S. 497, 512 (1950); *Mabee* v. *White Plains Publishing Co.*, 327 U. S. 178, 183–184 (1946). We see no reason to deviate from our traditional approach in this case.

## B

Petitioner urges us to look beyond the plain language of the statute, citing the often-quoted passage from *Holy Trinity*

Nor does the 1949 amendment to the Act provide support for petitioner's claim that the "hot goods" provision was never intended to apply to "innocent" secured creditors. To the contrary, the House Report reflects Congress' understanding that the 1938 law did not exempt innocent purchasers from the "hot goods" provision. "[A] purchaser who ships in commerce goods produced by another person who violated the wage-and-hour provisions of the act in the production of such goods, commits an unlawful act." H. R. Rep. No. 267, 81st Cong., 1st Sess., 39 (1949). Had Congress intended the 1938 Act to exempt innocent parties generally, amendment would have been unnecessary.

The amendment changed existing law only to the extent it made it "lawful for a purchaser in good faith of goods produced in violation of the act to sell such goods in commerce," H. R. Conf. Rep. No. 1453, 81st Cong., 1st Sess., 31 (1949), provided he or she obtained assurances "that the goods in question were produced in compliance with the act." *Ibid.* Thus, for the first time, Congress gave purchasers a mechanism for protecting themselves from unwitting violations of the Act, for which they would otherwise have been liable. See H. R. Rep. No. 267, *supra*, at 39.

*Church* v. *United States*, 143 U. S. 457, 459 (1892): "[A] thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." According to petitioner, the sole aim of the FLSA was to establish decent wages and hours for American workers. This goal, petitioner claims, is not furthered by application of § 15(a)(1) to creditors who acquire "hot goods" by foreclosure and are not themselves responsible for the minimum wage and overtime violations. However, we conclude that the legislative intent fully supports the result achieved by application of the plain language.

While improving working conditions was undoubtedly *one* of Congress' concerns, it was certainly not the *only* aim of the FLSA. In addition to the goal identified by petitioner, the Act's declaration of policy, contained in § 2(a), reflects Congress' desire to eliminate the competitive advantage enjoyed by goods produced under substandard conditions.[8]   29

---

[8] Section 2(a), codified at 29 U. S. C. § 202(a), provides:

"The Congress finds that the existence, in industries engaged in commerce . . . , of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) *constitutes an unfair method of competition in commerce;* (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) *interferes with the orderly and fair marketing of goods in commerce*" (emphasis added).

President Roosevelt's message to Congress, which served as the inspiration for passage of the Act, makes a similar point: "Goods produced under conditions which do not meet rudimentary standards of decency should be regarded as contraband and ought not to be allowed to pollute the channels of interstate trade." H. R. Doc. No. 255, 75th Cong., 1st Sess., 3 (1937). See *Powell* v. *United States Cartridge Co.*, 339 U. S. 497, 516 (1950). The President's message was cited approvingly throughout the legislative history of the 1938 Act. See, *e. g.*, S. Rep. No. 884, 75th Cong., 1st Sess., 1–3 (1937); H. R. Rep. No. 1452, 75th Cong., 1st Sess., 5–7 (1937); H. R. Rep. No. 2182, *supra*, at 5.

U. S. C. § 202(a). This Court has consistently recognized this broad regulatory purpose. "The motive and purpose of the present regulation are plainly . . . that interstate commerce should not be made the instrument of competition in the distribution of goods produced under substandard labor conditions, which competition is injurious to the commerce." *United States* v. *Darby*, 312 U. S. 100, 115 (1941). See also *Tony & Susan Alamo Foundation* v. *Secretary of Labor*, 471 U. S. 290, 296 (1985); *Maryland* v. *Wirtz*, 392 U. S. 183, 189 (1968); *Rutherford Food Corp* v. *McComb*, 331 U. S. 722, 727 (1947).

Application of § 15(a)(1) to secured creditors furthers this goal by excluding tainted goods from interstate commerce. Had the Department of Labor not obtained an injunction in this case, petitioner, as a secured creditor, would have converted several weeks of labor by the debtor's employees into goods covered by its security interest; the "hot goods" produced by these uncompensated employees would have competed with goods produced in conformity with the FLSA's minimum wage and overtime requirements. Moreover, prohibiting foreclosing creditors from selling "hot goods" also advances the goal identified by petitioner. Secured creditors often monitor closely the operations of employer-borrowers, as petitioner did in this case. They may be in a position to insist on compliance with the FLSA's minimum wage and overtime requirements. As the District Court for the Western District observed:

Despite these expansive indications of legislative purpose, petitioner insists that Congress was concerned about competition only to the extent that competition from "'chiselers'" had the effect of driving down wages and working conditions. Brief for Petitioner 24–25. However, based on the statute, its legislative history, and our prior decisions, we conclude that exclusion from interstate commerce of goods produced under substandard conditions is not simply a means to enforce other statutory goals; it is itself a central purpose of the FLSA.

"[I]f foreclosing creditors are free to ship and sell tainted goods across state lines, the temptation to overextend credit to marginal producers is strong, as is the likelihood that such producers will become unable to meet their payrolls. The reason for this is that finance companies and institutions stand to reap financial gain by keeping such producers in business. A holding by this Court that creditors may not ship and sell in interstate commerce goods produced in violation of the Act will not only protect complying manufacturers from the unfair competition of such tainted goods, but, we submit, *it will also discourage the type of commercial financing which leads to minimum wage and overtime violations.*" 621 F. Supp., at 26 (emphasis added).

## C

A literal application of § 15(a)(1) does not grant employees a priority in "hot goods" superior to that which a secured creditor has under state law. Petitioner's rights in the collateral as against Ely are unchanged by our holding. Petitioner still owns the goods, subject only to the "hot goods" provision, which prevents it from placing them in interstate commerce. The employees have not acquired a possessory interest in the goods.[9] Indeed, as the District Court for the Western District of Tennessee recognized, the Secretary brought this action "not to compel the foreclosing creditor to pay the statutory wages or to put pressure on the defaulting producer to pay such wages, but to keep tainted goods from entering the channels of interstate commerce." *Id.*, at 25–26. That petitioner can cure the employer's violation of the FLSA by paying the employees the statutorily required

---

[9] Of course, under state law, the employees may have a lien on the employer's property superior to petitioner's lien. See Tenn. Code Ann. § 66–13–101 (1982) (creating statutory wage lien on "corporate or firm property of every character and description"). However, any such lien would exist independent of the application of the FLSA to petitioner.

wages does not give the employees a "lien" on the assets superior to that of a secured creditor.[10]

In numerous other statutes, Congress has exercised its authority under the Commerce Clause to exclude from interstate commerce goods which, for a variety of reasons, it considers harmful. Like the FLSA, these regulatory measures bar goods not produced in conformity with specified standards from the channels of commerce.[11] As the District Courts in this case recognized, secured creditors take their security interests subject to the laws of the land. See 621 F. Supp., at 26; 608 F. Supp., at 217. If, for example, the goods at issue in this case were fabrics that failed to meet federal flammability standards and were therefore banned from interstate commerce under the Flammable Fabrics Act, 67 Stat. 111, as amended, 15 U. S. C. § 1191 *et seq.*, surely petitioner could not argue that it had a right to sell the inventory merely by virtue of its status as a secured creditor. "Hot goods" are not inherently hazardous, but Congress has determined that they are contraband nonetheless. We see no reason for a different result merely because a different form of contraband is involved.

## III

We hold that § 15(a)(1)'s broad prohibition on interstate shipment of "hot goods" applies to secured creditors who acquire the goods pursuant to a security agreement. This result is mandated by the plain language of the statute, and it

---

[10] Petitioner also argues that application of the "hot goods" prohibition to secured creditors will interfere with the operation of the Bankruptcy Code. Because Ely has not filed for bankruptcy, however, this issue is not before us.

[11] See, *e. g.*, 15 U. S. C. § 1192 (fabrics failing to conform to flammability standards); 15 U. S. C. § 1211 (household refrigerators without prescribed safety devices); 15 U. S. C. §§ 1263(a)–(c), (f) (misbranded or banned hazardous substances); 21 U. S. C. §§ 331(a)–(d) (adulterated or misbranded food, drugs, and cosmetics); 21 U. S. C. §§ 458(a)(2)–(4) (adulterated, misbranded, or uninspected poultry products).

furthers the goal of eliminating the competitive advantage enjoyed by goods produced under substandard labor conditions. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE SCALIA, concurring.

While I would affirm the Court of Appeals even if I agreed with petitioner that "the sole aim of the FLSA was to establish decent wages and hours for American workers," *ante*, at 36, and that this goal "is not furthered by application of § 15(a)(1)" to secured creditors, *ibid.*, I do not disagree with the Court's conclusions in Part II–B, and therefore join its opinion in full.

JUSTICE STEVENS, with whom JUSTICE WHITE joins, dissenting.

The statute that the Court construes today was enacted during the Great Depression. Although business failures were an everyday occurrence in 1938, nothing in the language or history of the Fair Labor Standards Act (FLSA or Act) suggests that Congress intended that Act to address the unfortunate situation that arises when an employer is unable to pay his employees for the final days of work that produced the inventory at hand when the plant was forced to close.

Indeed, if there is one conclusion that both parties before us, and every court that has ever considered this matter, agree upon, it is that Congress did not "actually conside[r] application of the 'hot goods' provision to secured creditors when it enacted the FLSA." *Ante*, at 34–35. This historical fact carries much weight in this case. The subjects of bankruptcy and secured transactions constitute discrete bodies of law, which are generally governed by the Federal Bankruptcy Code and by state law, respectively.[1] Instead of in-

---

[1] The FLSA was enacted to prevent employers from paying substandard wages. Section 15 (a)(1) is designed to prevent employers from producing goods at such low cost that they could undersell competitors who paid what Congress deemed to be a decent wage. The concern of the statute was the

terpreting Congress' silence as evincing intent to invade these areas with an Act whose purposes do not fit nicely into these contexts,[2] I would interpret Congress' utter silence as showing that Congress never intended to apply the FLSA to these unique areas of the law.[3]   See *Kelly* v. *Robinson*, 479 U. S. 36, 47 (1986).

---

ongoing business with its continuing impact on both the labor market and the commercial market.   It was not remotely concerned with the perennial problem of distress sales that follow in the wake of a business failure. Under the Court's novel reading of the Act, any such sale—whether by a secured creditor, a trustee in bankruptcy, or even by a creditor's committee trying to raise funds to meet a shortage in the final payroll—would be a sale of "hot goods" and therefore illegal.

[2] As Judge Engel explained in dissent from the Court of Appeals' decision:

"The practical effect of the majority's decision is not to remove any tainted goods from competition for, as happened here, almost always the result will be that the goods are sold, if not in foreclosure, then in bankruptcy, or by other attaching creditors.   As here, the goods will go out in the market, but whether they are sold for competitively destructive prices will not depend on the cost of their production but upon the manner of their sale in any event.   The real effect of the majority's interpretation is simply to create a judicial lien superior to the otherwise lawful lien which Citicorp possessed in the goods.   In my view, this kind of pressure is the only motivation in the government in its present construction of the Act.   Had it intended to create a federal lien law, Congress no doubt could. have done so, but it did not.   State laws governing creditors' rights, state laws protecting employees from non-payment of wages and bankruptcy laws generally, provide a great deal of relief for the protection of employees of defunct and insolvent corporations.   It seems to me that in this special area of concern, the operation of these more traditional sources of law was intended by Congress to be sufficient.   It is my opinion, therefore, that under a common sense application of section 15(a)(1), Congress was looking instead at application of the Act in the course of the ongoing production of goods and not at the situation obtaining here and in the like cases in the Second and Fourth Circuits."   *Brock* v. *Ely Group, Inc.*, 788 F. 2d 1200, 1207 (1986).

[3] Aside from my conclusion that secured creditors such as Citicorp are not barred from selling "hot goods," I also have doubts about whether the employees who participated in the production of the goods at issue in this case were "employed in violation of [the FLSA]" within the meaning of

Even were I not confident in that conclusion, however, I certainly believe that the arguments in favor of petitioner's construction are substantial enough to warrant our adherence to settled precedent. During the 28 years from the enactment of the FLSA through 1966 it appears that no Secretary of Labor ever sought an injunction against the sale of "hot goods" in circumstances such as these. See *Wirtz* v. *Powell Knitting Mills Co.*, 360 F. 2d 730, 733 (CA2 1966). When a Secretary did attempt to use the statute in this novel way, the Court of Appeals for the Second Circuit summarily rejected his interpretation, explaining:

> "We believe that there was no Congressional intent that concerns in [the creditor's] position be within § 15. The purpose of forcing payment of wages should not apply to the creditor who advanced funds long before the default in wages, and who merely forecloses his lien, at least where the value of the goods acquired does not exceed the debt left unpaid. Since [the creditor] is not giving present consideration, it can neither force [the employer] to make payment nor withhold wages from its payment and pay the wage earners itself. It already provided [the employer] with cash, part of which no doubt went for wages that were paid. Since the only reason to give effect to § 15 would be to force [the creditor] to pay the wages, § 15 ought not apply to it, in a backhanded way of attacking its secured position.
>
> "The Secretary stresses the point that when the Congress desired to protect bona fide purchasers from the strict wording of the Act it found it easy to do so by

---

§ 15(a)(1) of the Act at the time the goods were produced. See *ante*, at 30, n. 1. The terms of their employment complied with the statute and when they performed their services everyone expected and intended that they would be paid in full. It may well be true that the *employer* committed a violation of the Act when it was subsequently unable to meet its payroll, but I am not sure the inventory can be branded "hot goods" because of that subsequent event.

amending the Act with appropriate safeguards. This would indeed be persuasive if there were indications that the present problem of the foreclosing secured creditor had been brought to the attention of the Congress. The argument loses force because this was apparently never done, and the Secretary's present contention is much weakened by the fact that since the enactment of the Act in 1938 neither he nor his predecessors appear to have so read the Act, in spite of the myriad of instances in which similar security titles must have been enforced." *Id.*, at 733.

I would have subscribed to this reasoning in 1966, and certainly do now. In the more than 20 years since the Second Circuit's decision, its construction of the statute has not been called into question by the courts that have addressed the issue, except in the decisions now on review. See *Shultz* v. *Factors, Inc.*, 65 CCH LC ¶ 32,487 (CA4 1971); *Dunlop* v. *Sportsmasters, Inc.*, 77 CCH LC ¶ 33,293 (ED Tenn. 1975). Given the Secretary's practice prior to the *Powell Knitting* decision, the judicial acceptance of that decision, and the fact that Congress has not seen fit to amend the statute in light of these decisions,[4] I believe that the *Powell Knitting* construction should be retained until Congress rejects it. See *Commissioner* v. *Fink, post,* at 102–103 (STEVENS, J., dissenting); *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220, 268 (1987) (STEVENS, J., dissenting).

I respectfully dissent.

---

[4] The FLSA has been amended on at least four occasions since the *Powell Knitting* decision. See, *e. g.*, Pub. L. 99–150, 99 Stat. 787 (1985); Pub. L. 95–151, 91 Stat. 1245 (1977); Pub. L. 93–259, 88 Stat. 55 (1974); Pub. L. 89–601, 80 Stat. 830 (1966).